UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | *Criminal No. 08-11-P-S* |
| | ) | |
| RANNIK WILLIAMS DENT, | ) | |
| | ) | |
| *Defendant* | ) | |

### *RECOMMENDED DECISION ON MOTION TO SUPPRESS*

Rannik Williams Dent, charged by indictment with conspiracy to distribute and to possess with intent to distribute 50 grams or more of a mixture or substance containing cocaine base, in violation of 21 U.S.C. §§ 846 and 841(a)(1) (Count One), and possession with intent to distribute 50 grams or more of a mixture or substance containing cocaine base, in violation of 21 U.S.C. § 841(a)(1) (Count Two), *see* Indictment (Docket No. 17), moves to suppress evidence assertedly unlawfully seized from a residence in Lewiston, Maine. *See* Defendant Rannik Williams Dent's Motion To Suppress Statements and Physical Evidence ("Motion") (Docket No. 40) at 1-3.[1] An evidentiary hearing was held before me on July 14 and August 27, 2008, at which the defendant appeared with counsel. The government tendered four witnesses and offered 15 exhibits, which were admitted without objection. The defendant recalled one government witness and testified on his own behalf, and offered 16 exhibits, also admitted

---

[1] The defendant originally sought to suppress evidence seized from two residences in Lewiston, 45 Marble Street and 81 Marble Street, as well as statements that he made to police in the wake of those seizures. *See* Motion at 1-3. Defense counsel subsequently withdrew the argument concerning his client's statements and agreed that the argument concerning seizure from 45 Marble Street was mooted by the government's representation that it would not seek to introduce at trial any evidence seized from that residence. Thus, the only issue remaining to be adjudicated is the defendant's bid to suppress evidence seized from 81 Marble Street.

1

without objection.  At the close of the evidence, counsel for both sides argued orally.  I now recommend that the following findings of fact be adopted and that the Motion be denied.[2]

## I.  Proposed Findings of Fact

At about 3 p.m. on October 22, 2007, Wayne Clifford, a Lewiston, Maine police officer assigned to the United States Drug Enforcement Agency's High Intensity Drug Trafficking Area Task Force in Portland, Maine, began surveillance of a residence at 45 Marble Street ("45 Marble") in Lewiston in response to a tip that the defendant was distributing crack cocaine from that residence.  Clifford knew 45 Marble to be the residence of Erica Lever ("Erica"), and 81 Marble Street ("81 Marble") to be the residence of Erica's mother, Jaime Bolduc ("Jaime"), and sister, Meagan Lever ("Meagan").  Both Erica and Meagan had had prior encounters with the criminal justice system, and Clifford previously had participated in surveillance of 45 Marble in response to reports of drug-trafficking activity there.

At about 3:10 p.m., Clifford observed two black males, later identified as Kareem Johnson and the defendant, leave 45 Marble, get into a Chevrolet Blazer, and drive approximately 100 yards down the road to 81 Marble.  Clifford observed the defendant exit the vehicle and enter 81 Marble, following which Johnson drove the Blazer back to 45 Marble, parked, and reentered that residence.  Clifford lost sight of the defendant momentarily as he was entering 81 Marble and was unsure how he entered it, whether by knocking, ringing a bell, or simply walking through the door.  However, the defendant entered the residence quickly, and Clifford observed no one else at the door.

---

[2] Defense counsel orally moved at the close of hearing on July 14, 2008, to continue the hearing because his efforts to secure the attendance of a witness whom he considered essential, Meagan Lever, had been unavailing.  I granted that motion, and the hearing was continued to August 27, 2008.  Defense counsel arranged for service of subpoenas on three witnesses, Meagan Lever, Breanna Bolduc, and Jaime Bolduc.  However, for various reasons, he was unable to secure the attendance of any of those individuals on August 27.  He nonetheless determined, after obtaining certain agreements from opposing counsel concerning alternative evidence he planned to introduce on August 27, and conferring with his client, that it was in his client's best interests to proceed.

At about 3:15 p.m., Clifford observed Johnson and a male he recognized as Jean Fournier leave 45 Marble and get into the Blazer. Clifford knew that Fournier had been involved in the sale and distribution of cocaine base and was on probation for the same. He contacted Lewiston police officer Ryan Rawstron and requested him to follow the Blazer and stop it for a traffic infraction if he could do so.

Rawstron and Sergeant Michael Parshall followed the Blazer, clocked it as exceeding the speed limit, and stopped it on Veterans Memorial Bridge between Lewiston and Auburn. Parshall determined that Johnson was driving and that his driver's license was under suspension. He placed Johnson under arrest for operating a vehicle after suspension. Rawstron spoke with Fournier, who appeared visibly nervous and admitted that he was concealing drugs in his underwear. Clifford was called to the scene and spoke with Fournier, who told Clifford that he wished to cooperate with law enforcement and had 25 grams of crack in his underwear. Fournier removed a plastic bag containing an off-white chunky substance from his underwear. The substance, which appeared to Clifford to be crack cocaine, field-tested positive for the presence of cocaine.

At about 3:30 p.m., Fournier was arrested and taken to the local office of the Maine Drug Enforcement Agency. In an approximately hour-long interview, he told Clifford that:

1.  He and Johnson had arrived at 45 Marble one hour prior to his arrest. He had wanted to speak with Erica about her purchase of compact discs and other items Fournier had left over from a store he had closed.

2.  He and Johnson were unable to locate Erica and so went to her mother's house, 81 Marble, to look for her. There, they ran into "Animal," the defendant, who asked Fournier to do him a favor and deliver a package of crack cocaine to the K-mart parking lot in Auburn. The

3

defendant also told him that Erica was at 45 Marble, probably sleeping.  The defendant, Johnson, and Fournier then drove to 45 Marble.

      3.      Fournier found Erica, who had been sleeping.  The defendant went somewhere, returned, and gave Fournier two plastic bags, each containing crack cocaine, and instructed him to deliver one or both bags to a subject waiting in a red van in the K-mart parking lot off of Route 4 in Auburn, depending on how much money the subject paid.  If the subject paid $1,100, Fournier was to deliver both bags, give $900 to the defendant, who would be waiting at 81 Marble, and retain $200 as a commission for himself.  If the subject paid less than $1,100, Fournier was to deliver one bag and return the other bag, plus whatever monies he had collected, to the defendant.

      4.      Fournier observed the defendant in possession of several ounces of crack cocaine contained in a white plastic grocery bag that the defendant had with him at 45 Marble.  He saw Johnson drive the defendant, who was carrying the white plastic bag, back to 81 Marble.  Johnson knew nothing of the crack cocaine dealing and had no part in it.  When Johnson returned to 45 Marble, Fournier and Johnson left the residence.  They were stopped moments later by the police on Veterans Memorial Bridge, as previously described.

Fournier's phone rang four or five times during his interview with Clifford.  Fournier told Clifford that it was "Animal" calling, surely to inquire about whether Fournier had completed the transaction.  During the interview, Clifford did some checking and learned that there was an outstanding warrant for the defendant's arrest for failing to appear for a driving offense.  At the conclusion of the interview, Clifford spent 20 or 30 minutes typing applications for search warrants for both 45 Marble and 81 Marble.  However, after consulting with other agents, he abandoned the effort to obtain warrants out of a concern that the defendant, who had been trying

unsuccessfully to reach Fournier, would realize that something had gone wrong with the drug transaction, destroy or hide evidence, and possibly flee. Clifford and other officers devised a plan to arrive in two groups at 45 Marble and 81 Marble simultaneously in hopes of locating the defendant and recovering any crack cocaine he might have. Clifford had no reason to believe that anyone at 81 Marble other than the defendant was involved in drug trafficking.

    About two hours after the traffic stop, at approximately 5:20 p.m., the plan was carried out. Clifford was among officers who gathered in front of a school building across the street from 81 Marble. Clifford crossed the street, met homeowner Tom Bolduc ("Tom"), Jaime's husband, in the driveway, and sought and received his consent to enter the residence to search for the defendant to arrest him on the outstanding warrant. At that time, Clifford did not ask to search the residence itself other than for the defendant. Clifford and others searched 81 Marble and did not find the defendant. Meanwhile, Tom phoned Jaime, who was a half-mile away at the site of a day care she owned, and asked her to come home. Jaime did so immediately, arriving at 81 Marble about 10 minutes after agents had first spoken with her husband. She walked into what she described as a "hectic situation," with a number of cars and officers whom she did not recognize on her premises and children crying. Just before or just after Jaime's arrival, Clifford received word that the defendant had been found and taken into custody at 45 Marble.

    Clifford requested the Bolducs' permission to search their home for evidence of drug trafficking, namely a white plastic grocery bag believed to have been left by the defendant that contained cocaine. Jaime was upset to learn that police suspected that drugs were stored at her home. She asked that agents contact Lewiston Police Detective Trevor Campbell, with whom she had developed a rapport. Agents did so. Campbell, who had no prior connection to the investigation and had been off-duty, arrived within 10 minutes of Jaime's request. Clifford

briefed him, noting that agents were seeking a bag containing crack cocaine believed to have been brought to 81 Marble by the defendant.  Campbell then spoke to the Bolducs in their kitchen, assuring them that agents were seeking their cooperation in finding a bag left by the defendant, believed to contain crack, and were not otherwise interested in their home.  Tom Bolduc was reluctant to permit agents into his bedroom, but the Bolducs orally agreed to the search.  Neither agent inquired whether the Bolducs had seen the defendant that day.

As soon as her husband expressed agreement to the search, Jaime looked at Campbell and said, "Follow me."  He did so, and Clifford followed Campbell.  Jaime led Campbell into a first-floor bedroom, grabbed a black duffel bag propped up against a wall and said, "Here, look in here."  Campbell took the bag, which was zippered closed but unlocked, placed it on a bed, and opened the front compartment.  He reached into it and pulled out a white plastic bag fitting the description given by Fournier.  He opened the plastic bag, which contained what appeared to be a quantity of crack cocaine the size of a tennis ball.  The plastic bag was not visible from the exterior of the duffel bag, and the cocaine was not visible from the exterior of the plastic bag.  Jaime was surprised and visibly upset by the discovery of drugs in her residence.  After retrieving the plastic bag, Campbell searched the main compartment of the duffel bag and found, among toiletries and other personal items, an Amtrak train ticket in the name of Rannik Williams Dent.  *See* Gov't Exhs. 1, 1a-f, 2-3.  Campbell turned the bag over to Clifford.

Clifford asked Jaime whose bedroom they were in.  Jaime said that it was a room in which her daughter Meagan occasionally slept, although Meagan did not pay rent.  Meagan had just returned from a trip to Florida, and the room was messy, with luggage strewn about.  Clifford asked that Meagan be contacted and asked to stop by the residence to obtain her consent for a search.  Jaime responded that it was her house, she could search anyplace within it that she

wanted, and neither she (nor agents) needed anyone else's permission to search. Clifford said that, nevertheless, he still would like Meagan to drop by. Jaime phoned Meagan, who arrived shortly thereafter. Clifford requested Meagan's permission to conduct a thorough search of the room for any evidence of drug trafficking. Meagan consented and signed a written form so indicating. *See* Gov't Exh. 4. Campbell spoke with the Bolducs, who also memorialized in writing their consent to search their house for evidence of drug trafficking. *See* Gov't Exh. 7.

The Bolduc household at 81 Marble consisted of Jaime, Tom, Jaime's adult daughter Meagan, her 17-year-old daughter Breanna, her 12-year-old son Max, and her 8-year-old grandson Bradon. Jaime had unfettered access to Meagan's first-floor bedroom. Every room in the house was accessible to every other person residing there.

Jaime had known the defendant, whom she considered Erica's friend, for about a year.[3] The defendant divided his time between New York and Maine. When he was in Maine, he resided at 45 Marble and was a frequent visitor to 81 Marble. In addition to being a friend of Erica's, he developed a romantic relationship with her sister Meagan and a close relationship with her siblings Max and Breanna. *See* Defendants' Exhs. 6-8, 11-19.

Nonetheless, the defendant did not reside at 81 Marble or rent or lease any part of it, and he had never asked Jaime or Tom's permission to store any of his personal belongings there and did not have their permission to do so. While he was a frequent visitor, he was not Jaime and Tom's invited guest; rather, in Jaime's words, "he would kind of just show up, looking for Erica, looking for Meagan." On some occasions, Jaime tolerated his presence. On others, she told him to leave. She did so because she had small children in her house and felt that Erica's friends belonged at Erica's house.

---

[3] Although Jaime had known the defendant for only a year, he had been coming up to Maine for 10 years, since he was 14 years old.

7

The defendant gave 81 Marble as his address when obtaining his driver's license. However, he had not sought the homeowners' permission to do so. When Jaime became aware, shortly before the defendant's arrest, that mail had arrived for him at 81 Marble from the Department of Motor Vehicles and a hospital, she told him not to have his mail sent there.[4]

On two or three occasions, Jaime woke up to find the defendant sleeping in her home, once in a recliner, once in Meagan's room when Meagan was not there, and possibly once in the basement. The defendant had not sought, and did not have, her permission or that of her husband to stay in their home overnight. When Jaime discovered that the defendant had stayed overnight, she asked him not to, explaining that she had enough people in her home, including small children, and did not have an open-door policy. Jaime deliberately refrained from informing her husband that the defendant had stayed overnight in the house so as to avoid upsetting him. Because they have young children, the Bolducs have a household rule that no boyfriend is permitted to sleep overnight in their home. The defendant spent the night prior to his arrest with Meagan in her bedroom, and had sex with her in a shower on the first floor of the home.[5]

Prior to his arrest, the defendant carried with him on a regular basis the black bag searched by Campbell. He had previously brought it to 81 Marble. The defendant never gave anyone permission to search his bag, in which he kept personal effects. When he left it at 81

---

[4] The defendant testified that Jaime had expressly given him permission to use 81 Marble as his address for purposes of his driver's license application. I credit Jaime's unequivocal testimony that he had no such permission.

[5] The defendant testified that he had been back in Maine for about three months prior to his arrest and that, during that time, he had slept at 81 Marble 50 percent of the time and at 45 Marble 50 percent of the time. He testified that (i) Tom and Jaime were like parents to him, (ii) he was like an older brother to Breanna and Max, (iii) he accompanied the Bolducs on family outings, and (iv) he routinely watched Bradon and Max after school and helped them with homework. While the defendant was a frequent visitor at 81 Marble and developed close relationships with some of the younger family members, I credit Jaime's clear, unequivocal testimony that he was never Tom or Jaime's invited guest at 81 Marble, never was invited or given permission either to spend the night or to store belongings there, and was expressly told not to spend the night or receive mail at 81 Marble. If the defendant did stay the night at 81 Marble on more than the two or three occasions described by Jaime, I find that he did so surreptitiously, without the knowledge or permission of the homeowners, Jaime and Tom. Moreover, the defendant told Clifford, during a post-arrest interview, that he resided at 45 Marble, despite having listed 81 Marble as his address on his driver's license, and denied that he lived or even stayed at 81 Marble.

Marble on the day of his arrest, he intended to return to retrieve it. At about 3 p.m. that day, Jaime had seen the defendant sitting in a recliner in her living room at 81 Marble, talking on the phone with a black bag beside him. She had seen him with a black bag on other occasions, including a few days earlier, when he removed from it, in her presence, a watch he had bought her as a gift in New York. Jaime did not know that the defendant had stored a bag in the house. Had he asked her permission to do so, she would not have given it.[6]

## II. Discussion

The defendant seeks to suppress all evidence seized from his black bag on October 22, 2007, on the grounds that:

1. As a guest at 81 Marble, he had a reasonable expectation of privacy in both the room where he spent nights and in the contents of his closed bag. *See* Motion at 7-9.

2. Jaime and Tom Bolduc had neither actual nor apparent authority to consent to a search of his bag. *See id*. at 9-10.

3. In the absence of the defendant's consent or a warrant, the search contravened his Fourth Amendment rights. *See id*. at 10-11.

The government rejoins that (i) the defendant had no expectation of privacy in the residence at 81 Marble, and forfeited any expectation of privacy he might have had in his bag by leaving it there without the homeowners' permission, (ii) in any event, Jaime had either actual or apparent authority to consent to a search of the bag, and (iii) even were that not so, discovery of the cocaine at 81 Marble was inevitable given that Meagan was then subject to bail conditions that would have permitted the search. *See* Government's Objection to Defendant's Motion To Suppress Statements and Physical Evidence ("Objection") (Docket No. 53) at 8-15.

---

[6] The defendant testified that he left his black bag at 81 Marble all the time. If he did so, it was without the knowledge or consent of the homeowners, Tom and Jaime. He admitted on cross-examination that he did not have their permission to leave his bag there.

I find the threshold issue, whether the defendant enjoyed a reasonable expectation of privacy, to be dispositive and, hence, I do not reach the parties' remaining points. As the First Circuit has explained:

> Before reaching the merits of a suppression challenge, the defendant carries the burden of establishing that he had a reasonable expectation of privacy with respect to the area searched or, as in this case, the items seized. While the Supreme Court noted that this threshold analysis is more properly placed within the purview of substantive Fourth Amendment law than within that of standing, courts continue to refer to it as an issue of "standing."

*United States v. Lipscomb*, 539 F.3d 32, 35-36 (1st Cir. 2008) (citations and internal quotation marks omitted). "To qualify under this mantra, a privacy expectation must meet both subjective and objective criteria: the complainant must have an actual expectation of privacy, and that expectation must be one which society recognizes as reasonable." *Vega-Rodriguez v. Puerto Rico Tel. Co.*, 110 F.3d 174, 178 (1st Cir. 1997); *see also, e.g., United States v. Gray*, 491 F.3d 138, 145 (4th Cir. 2007) ("To be legitimate, an expectation of privacy must be objectively reasonable: it must flow from a source outside of the Fourth Amendment, either by reference to concepts of real or personal property or to understandings that are recognized and permitted by society.") (citations and internal quotation marks omitted).

The defendant demonstrates that he harbored an actual, subjective expectation of privacy with respect to both 81 Marble, or at least Meagan's room, and the closed black bag that he left there. He had slept in the room, which was that of his girlfriend, and regularly carried the bag in question, which contained personal items and which he had intended, prior to his arrest, to retrieve. However, his bid for suppression founders on the objective prong of the analysis: he falls short of showing that his expectations were ones that society recognizes as reasonable.

### A. Objective Analysis: Home (81 Marble)

"[N]ot every visitor merely present with the consent of the householder has a legitimate expectation of privacy." *Gray*, 491 F.3d at 145 (citation and internal quotation marks omitted). "It is rather a foundational principle that not all persons in the company of the property owner have the owner's right to assert the spatial protection." *Id.* (citation and internal quotation marks omitted). Nonetheless, as the defendant points out, *see* Motion at 7, at least one class of visitor has clearly been recognized as possessing a legitimate expectation of privacy in another's home: overnight guests, *see, e.g., Minnesota v. Olson*, 495 U.S. 91, 98 (1990) ("To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share."); *United States v. Jiménez*, 419 F.3d 34, 40 (1st Cir. 2005) ("an overnight guest has an expectation of privacy in the home in which he is staying").

The difficulty for the defendant, however, is that although he occasionally stayed overnight at 81 Marble, he never did so as an overnight "guest" of the homeowners, Jaime and Tom Bolduc. To the contrary, Jaime flatly told him, after discovering that he had stayed overnight without her permission, that he was not welcome to do so. Surreptitious overnight stays do not confer status as an "overnight guest" for Fourth Amendment purposes. *See, e.g., Long v. Roberts*, 277 Fed. Appx. 801, 805 (10th Cir. 2008) (defendant was not an "overnight guest" in friend's apartment when, although friend had previously consented to defendant's spending the night, no such plan had been made on night in question, and defendant entered apartment by breaking down door; "The Fourth Amendment . . . does not protect an individual's subjective expectation of privacy in a home he has entered without consent."); *United States v. Ponder*, 240 Fed. Appx. 17, 19 (6th Cir. 2007) ("[T]he Supreme Court has held that an overnight

guest, unlike a guest present at a home without the homeowner's consent, has a reasonable expectation of privacy that will support standing."); *United States v. Larry*, 129 Fed. Appx. 127, 130 (6th Cir. 2005) (son did not have legitimate expectation of privacy in mother's home when he did not reside there and was neither an overnight guest nor a permitted social visitor on day in question; in fact, mother had told son to stay out of her apartment when she was not home); *United States v. Gonzalez-Barrera*, 288 F. Supp.2d 1041, 1050 (D. Ariz. 2003) ("[A]n 'overnight guest' is more than someone who simply spends the night. Such status is contingent on an invitation by an authorized host: That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy.") (citations and internal quotation marks omitted).[7]

On the other hand, a visitor need not necessarily establish status as an "overnight guest" to demonstrate a legitimate expectation of privacy in the premises. *See, e.g., United States v. Fields*, 113 F.3d 313, 320-21 (2d Cir. 1997) (fact that defendant did not sleep in apartment did not doom Fourth Amendment claim when he had a key to premises, paid $125 per week for privilege of using it, made use of it on 40 or 50 occasions, could bring guests, and, with minor restrictions, could come and go as he pleased, even if host not present; noting that *Olson* stands for the proposition that any guest in appropriate circumstances, not just an overnight guest, "may have a legitimate expectation of privacy when he is there with the permission of his host, who is willing to share his house and his privacy with his guest") (citation and internal quotation marks omitted).

---

[7] I do not understand the defendant to argue that Meagan, an occupant of 81 Marble who paid no rent, had authority to confer "overnight guest" status on him. *See* Motion at 7-8. To the extent that he does, I reject the proposition. *See United States v. Berryhill*, 352 F.3d 315, 318 (6th Cir. 2003) ("[T]he reason a houseguest has a reasonable expectation of privacy is because he knows that the host would respect his privacy, having obtained the host's permission to be at the residence. *Olson* cannot be taken for the proposition that guests' visitors can be assured that their privacy will be respected by the lawful owners or tenants of the residence. Berryhill does not dispute that he never received permission to stay at the apartment directly from its tenant; therefore, he could not be assured that his host would respect his privacy. Berryhill's expectation of privacy was not reasonable.")

Yet, whatever the outer bounds of *Olson*, they do not stretch far enough to encompass the facts of this case as I have proposed that they be found. The defendant was not the homeowners' invited guest even during the daytime; rather, he simply dropped in. He adduced no evidence that he had a key or that he otherwise was permitted by the homeowners to come and go as he pleased. He paid no rent or any other consideration to use the premises. More pointedly, after using the 81 Marble address without the homeowners' permission, he was told in no uncertain terms to cease doing so and, when discovered to have stayed overnight, he was asked by the homeowner not to do so. Finally, he never asked permission to store a bag in the house, and had he done so, permission would have been denied. In short, he lacked an objectively reasonable expectation of privacy in 81 Marble. *See, e.g., United States Whitehead*, 415 F.3d 583, 588 (6th Cir. 2005) (defendant visitor did not have reasonable expectation of privacy in friend's residence when, *inter alia*, despite having been frequent visitor for five months and having eaten meals with friend, he never stayed overnight and failed to present evidence such as repair bills or phone records linking him to residence); *United States v. Dix*, No. 94-4065, 1995 WL 351182, at *2 (6th Cir. June 9, 1995) ("We find that Dix does not have standing to object to the search of Butler's residence. As a casual, albeit frequent, visitor to his sister's apartment, who did not keep clothing there, who did not receive mail there, and who had no key, Dix had no reasonable expectation of privacy in the premises.").

### B. Objective Analysis: Container (Black Bag)

The defendant correctly observes that a person generally has an expectation of privacy in items placed in a closed container and that he does not forfeit that expectation of privacy merely because the container is located in a place that he does not exclusively control. *See* Motion at 9; *see also, e.g., United States v. Meada*, 408 F.3d 14, 23 (1st Cir. 2005) (person "generally has an

13

expectation of privacy in items he places in a closed container"); *United States v. Fultz*, 146 F.3d 1102, 1105 (9th Cir. 1998) ("A person does not forfeit that expectation of privacy merely because the container is located in a place that is not controlled exclusively by the container's owner."); *see also United States v. Davis*, 332 F.3d 1163, 1167 (9th Cir. 2003) (same). However, it is a different question whether a person forfeits his expectation of privacy in a container located in a place over which he has *no* legitimate control. I find that to have been the case here.

As the government points out, *see* Objection at 9-11, there are circumstances in which, despite a subjective intent to retrieve a container, an individual may be said to have "abandoned" it or, put differently, to have taken the risk that third parties, including authorities, might gain access to its contents, *see, e.g., United States v. Denny,* 441 F.3d 1220, 1227 (10th Cir. 2006) ("Even where a suspect does not subjectively intend to relinquish all ownership interest in an item, such suspect may nevertheless relinquish his or her reasonable expectation of privacy in the item.").

These circumstances include, for example, situations in which a defendant temporarily entrusts his bag to a stranger in an airport, *see United States v. Austin*, 66 F.3d 1115, 1119 (10th Cir. 1995) ("By leaving his bag in the possession and control of Hollis [a stranger at an airport], defendant assumed the risk that Hollis would allow the authorities access to the bag. . . . Although defendant did not intend for Hollis to turn over care of the bag to airport police, he voluntarily gave Hollis the ability to do so."), and throws a shoulder bag over a fence, *see United States v. Collis*, 766 F.2d 219, 222 (6th Cir. 1985) (finding no error in district court's conclusion that "the defendant had abandoned the bag when he threw it over a fence and that the defendant

had failed to establish a subjective expectation of privacy that society is prepared to accept as reasonable").

While the defendants in *Austin* and *Collis* placed or jettisoned their belongings in public places, defendants also have been held to have forfeited an objectively reasonable expectation of privacy in circumstances in which they left belongings in ostensibly private places without proper authorization. *See, e.g., United States v. Kellogg*, 202 Fed. Appx. 96, 101 (6th Cir. 2006) (district court did not err in concluding that defendant lacked reasonable expectation of privacy in containers stored in third party's garage when it credited third party's testimony that defendant lacked his permission to store containers there; "If indeed Kellogg had White's permission to store his containers in the barn, then he may have had a reasonable expectation of privacy at stake in the search"); *United States v. McCarthy*, 77 F.3d 522, 535 (1st Cir. 1996) (defendant's argument that he harbored legitimate expectation of privacy in contents of suitcase was undercut not only by the fact that he left it unlocked and open in back room of third party's trailer but also by fact that he left it after trailer's owner had told him to leave).; *compare, e.g., United States v. Childs*, No. 06-10339-DPW, 2008 WL 941779, at *2 n.3, *7 & n.6 (D. Mass. Apr. 4, 2008) (holding that defendant had legitimate expectation of privacy in bag left in tenant's daughter's bedroom closet with express permission of tenant to store bag there; noting, "Generally, the idea that a person has a[n] expectation of privacy in a closed, personal container left in another person's home with permission of the permanent resident is reasonable.") (footnote omitted).

In this case, the defendant never asked the homeowners' permission to store belongings in their house; would not have been granted such permission had he asked; and, in my view, was well aware that such permission would not be forthcoming. To the extent that Jaime had become aware that the defendant had made use of her residence for purposes other than casual daytime

15

visitation, for example, staying overnight or using 81 Marble as his mailing address, she had expressly forbidden him to do so. He could not have harbored any reasonable belief that it was permissible for him to store his belongings there. Further, as Jaime testified, 81 Marble was a home in which every resident had equal access to all rooms within. In leaving his bag unattended in Meagan's first-floor bedroom, without the knowledge or permission of the homeowners, whom he knew would have denied such permission, the defendant took the risk that the homeowners would invade the privacy of his closed but unlocked bag. He thereby forfeited whatever expectation of privacy he otherwise might have harbored in its contents.[8]

Having failed to demonstrate an objectively reasonable privacy interest in the premises searched or the contents of the bag searched and seized, the defendant has fallen short of placing "the *bona fides* of the search and seizure . . . legitimately into issue." *United States v. Aguirre*, 839 F.2d 854, 856 (1st Cir. 1988). His motion to suppress accordingly must be denied.

### III. Conclusion

For the foregoing reasons, I recommend that the Motion be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

---

[8] *Davis*, on which the defendant relies for the proposition that an individual does not forfeit his expectation of privacy merely because a closed container is located in a place not controlled exclusively by him, *see* Motion at 9, is distinguishable. The defendant in *Davis* was, at the least, an overnight guest in the apartment of his girlfriend, had hidden his bag underneath the bed in which he slept, and kept his belongings there. *See Davis*, 332 F.3d at 1167-68. No issue thus was presented concerning permission to store the bag.

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 26th day of September, 2008.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge